OPINION
{¶ 1} Defendant-appellant, Lawrence A. Ford, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of murder, burglary, possessing criminal tools, and tampering with evidence. For the reasons that follow, we affirm in part and reverse in part the judgment of the trial court.
 {¶ 2} On June 30, 2006, at the "Express Market" on East Fifth Avenue, in Columbus, Ohio, Eric Ford was shot and killed by Hussam Alaind. As a result of this killing, defendant was indicted on multiple charges. As amended before the jury trial began, the indictment charged defendant with one count of murder, a violation of R.C. 2903.02 (count one); one count of burglary, a violation of R.C. 2911.12 and a felony of the *Page 2 
second degree (count two); one count of possessing criminal tools, a violation of R.C. 2923.24 and a felony of the fifth degree (count three); and one count of tampering with evidence, a violation of R.C. 2921.12 and a felony of the third degree (count four).
 {¶ 3} A jury trial commenced on February 1, 2007, and the following evidence was adduced at that trial.
 {¶ 4} Hussam Alaind's direct testimony indicated as follows. Alaind worked the night shift at the Express Market on Fifth Avenue in Franklin County. He was not really responsible for security but he would stay at the Express Market at night even though it did not open until 7 a.m. Alaind was at the store during the night of June 30, 2006. He watched a movie and then fell asleep. He awoke to the sound of breaking glass, and he saw two men in the store. He retrieved a gun in the office where he had been sleeping. It was dark in the store and Alaind saw something in one of the man's hands, which he thought was a gun. Alaind shot the man, who was later identified as Eric Ford. Both of the intruders were wearing a mask and Alaind never saw either man's face. Alaind pointed the gun at the second intruder and shot the weapon. The second intruder disappeared and Alaind did not see him again. Alaind called 911, and the police arrived at the scene.
 {¶ 5} Defendant's counsel cross-examined Alaind regarding his ability to see the second intruder, including whether he could see what this man was wearing. Alaind essentially testified that it was dark, things happened very quickly, and he was unable to see what the second intruder was wearing.
 {¶ 6} Columbus Police Officer Peter Pappas was dispatched to the Express Market on June 30, 2006, to respond to a shooting. When he arrived at the scene, the gate to the store was open and one of the front windows was smashed. Officer Pappas *Page 3 
was familiar with the store because he frequently had been dispatched to go there. Upon seeing the damage to the window, Officer Pappas drew his weapon. He loudly identified himself, and a man with a gun, later identified as Alaind, appeared near a corner of the store. He ordered Alaind to drop the weapon, and Alaind complied. Medics and other officers arrived at the scene. The medics were told to examine the person who had been shot inside the store, and the scene was secured by the officers.
 {¶ 7} Columbus Police Officer Jack Adkins was dispatched to the Express Market, which is located at the corner of Fifth Avenue and Peters Avenue, on June 30, 2006, as a result of the shooting. When the initial call went out regarding the shooting, Officer Adkins was at a police substation located approximately one mile from the store. On his way to the store, he saw someone, who was later identified as defendant, walking westbound on the sidewalk on Leona Avenue. Defendant appeared "very nervous" and "almost looked as if he might have been running." (Feb. 2, 2007, Tr. 142.) It was between 4:30 and 5 a.m. The officer noticed defendant cupping something in his right hand and positioning that hand in a way that the hand was obscured by his right leg. The officer told him to stop. Initially, defendant did not stop but continued to walk. The officer again told him to stop and defendant said, "Who, me?" Id. at 144. The officer quickly exited his cruiser.
 {¶ 8} Defendant stopped and "whatever it was he had in his hand, he had thrown it down to the ground." Id. at 146. It did not appear to Officer Adkins that defendant had accidentally dropped the items. Defendant tried to kick what had been in his hand. The items thrown to the ground were later identified as a pair of latex gloves and a stocking knit panty hose. Defendant told the officer that he had been playing basketball at the Mount Vernon Plaza, and that he was on his way to his home on East 21st. Defendant *Page 4 
told the officer that Eric Ford was his nephew and that Eric lived with him. To the officer it appeared as though defendant had backtracked or headed in the wrong direction based on what defendant told him. The officer noticed that defendant was sweating "pretty bad" and "breathing kind of heavy." Id. at 149-150. The officer placed his hand over defendant's heart, which is a technique used to see if someone has been running, and he found that defendant's "heart was beating pretty good." Id.
 {¶ 9} Columbus Police Detective Daniel McGahhey was the primary detective overseeing the investigation of the shooting and testified that a crowbar and a hoop with an attached plastic bag were found at the scene near Eric Ford's body. Detective McGahhey explained that the use of the hoop with the bag would facilitate a quicker gathering of items. The police recovered a gray sweatshirt in the alley of 1102 Peters Avenue.
 {¶ 10} After the state's witnesses had testified, defendant's counsel, pursuant to Crim. R. 29, moved for a judgment of acquittal on all four counts. The trial court denied the motion. At the conclusion of the trial, the jury found defendant guilty of tampering with evidence, but could not reach a verdict as to the remaining counts. Therefore, a mistrial was declared as to counts one, two, and three.
 {¶ 11} A second jury trial was held in August 2007. Columbus Police Detective Tom Seevers, who did not testify at the first trial, testified in detail at the second trial regarding the collection of the evidence, including the gray sweatshirt, stockings, and gloves. Detective McGahhey, the detective who oversaw the investigation of the shooting, again testified regarding that investigation and the items that were collected in connection with the investigation. Alaind's testimony from the first trial was read into the record. Officer Pappas' testimony at the second trial was substantially the same as his *Page 5 
testimony at the first trial. Officer Adkins' testimony at the second trial was also substantially the same as his testimony at the first trial.
 {¶ 12} Other evidence was presented for the first time at the second trial. At the second trial, a criminalist testified regarding a DNA analysis that she performed in connection with the gray sweatshirt recovered by the police. The criminalist found a match between an oral swab taken from defendant and a sample from the gray sweatshirt. Additionally, Yul Gravely testified regarding his conversations with defendant during their time together at the Franklin County jail. Gravely testified that defendant told him that "[h]e was in [the jail] for breaking in stores. And one of the times that he actually broke in to the store, his nephew got killed and it went bad and he ended up getting caught." (Aug. 20, 2007, Tr. 92.) Gravely also testified that defendant told him that he had lied to the police, including fabricating a story that he had been playing basketball.
 {¶ 13} At the conclusion of the second trial, defendant was found guilty of murder, a violation of R.C. 2903.02, burglary, a violation of R.C. 2911.12 and a felony of the second degree, and possessing criminal tools, a violation of R.C. 2921.12 and a felony of the fifth degree.
 {¶ 14} The trial court sentenced defendant to 15 years to life on the murder count (count one), eight years on the burglary count (count two), 11 months on the possession of criminal tools count (count three), and four years on the tampering with evidence count (count four). The trial court ordered the sentences imposed for counts one, two, and three to run concurrently, and ordered the sentence imposed for count four to run consecutively to the sentences imposed for counts one, two, and three. Thus, the total sentence imposed on defendant by the trial court was 19 years to life in prison. *Page 6 
 {¶ 15} Defendant appeals and sets forth the following assignments of error for our review:
 ASSIGNMENT OF ERROR #1
 THE TRIAL COURT PLAINLY ERRED BY NOT SUPPRESSING STATEMENTS MADE BY THE DEFENDANT AND EVIDENCE GATHERED AT THE SCENE WHEN THE POLICE ILLEGALLY STOPPED AND DETAINED THE DEFENDANT THEREBY VIOLATING DEFENDANT'S RIGHTS UNDER THE FOURTH AMENDMENT OF THE U.S. CONSTITUTION AND SECTION 14, ARTICLE I OF THE OHIO CONSTITUTION AGAINST UNREASONABLE SEARCHES AND SEIZURES.
 ASSIGNMENT OF ERROR #2
 DEFENDANT'S CONVICTIONS IN THE FIRST AND SECOND TRIALS WERE NOT SUPPORTED BY THE SUFFICIENCY OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1 16 OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR #3
 THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S CRIMINAL RULE 29 MOTIONS FOR JUDGMENT OF ACQUITTAL IN BOTH TRIALS.
 ASSIGNMENT OF ERROR #4
 DEFENDANT'S CONVICTIONS IN THE FIRST AND SECOND TRIALS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 ASSIGNMENT OF ERROR #5
 DEFENDANT'S CONVICTION FOR MURDER UNDER R.C. 2903.02(B) VIOLATED HIS RIGHTS TO DUE PROCESS AND EQUAL PROTECTION AS GUARANTEED BY SECTIONS 2 AND 10, ARTICLE I OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION. *Page 7 
 ASSIGNMENT OF ERROR #6
 THE TRIAL COURT ERRED IN ENTERING A GUILTY VERDICT ON THE CHARGE OF FELONY MURDER AS R.C. 2903.02(B) EXPRESSLY PROVIDES THAT THE STATUTE IS INAPPLICABLE WHEN THE DEFENDANT CAN BE CHARGED WITH INVOLUNTARY MANSLAUGHTER.
 ASSIGNMENT OF ERROR #7
 BASED UPON THE EVIDENCE ADDUCED AT TRIAL, THE DEFENDANT'S CONVICTION FOR MURDER UNDER R.C. 2903.02(B) VIOLATED STATE LAW AND THE DEFENDANT'S RIGHTS TO DUE PROCESS AND EQUAL PROTECTION AND HIS RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AS GUARANTEED BY THE FOURTEENTH AND EIGHT[H] AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 1, 2, 9, 10 16 OF ARTICLE I OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR #8
 DEFENDANT'S NON-MINIMUM AND CONSECUTIVE SENTENCE FOR TAMPERING WITH EVIDENCE VIOLATED THE PROVISION AGAINST EX POST FACTO LAWS AND HIS DUE PROCESS RIGHTS CONTAINED IN THE OHIO AND U.S. CONSTITUTIONS.
 ASSIGNMENT OF ERROR #9
 THE TRIAL COURT ERRED IN GIVING AMBIVALENT CAUSATION JURY INSTRUCTIONS IN THE MURDER CHARGE AND IN NOT GIVING MORE SPECIFIC JURY INSTRUCTIONS REGARDING CIRCUMSTANTIAL EVIDENCE.
 ASSIGNMENT OF ERROR #10
 TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY NOT SEEKING THE SUPPRESSION OF THE EVIDENCE RESULTING FROM THE STOP AND DETENTION OF THE DEFENDANT; BY FAILING TO SEEK THE DISMISSAL OF THE MURDER CHARGES ON STATUTORY, COMMON LAW, AND CONSTITUTIONAL GROUNDS; BY FAILING TO OBJECT TO THE DEFENDANT'S CONSECUTIVE SENTENCE FOR MURDER *Page 8 
AND TAMPERING WITH EVIDENCE; AND BY FAILING TO OBJECT TO THE AMBIGUITY OF THE CAUSATION JURY INSTRUCTIONS.
 {¶ 16} On May 19, 2008, defendant moved to file a supplemental brief, which this court granted. Defendant's supplemental assignments of error allege as follows:
 [SUPPLEMENTAL] ASSIGNMENT OF ERROR #1
 THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY OVERRULING HIS OBJECTIONS TO THE STATE'S USE OF ITS PEREMPTORY CHALLENGES TO EXCLUDE RACIAL MINORITIES BY EXCUSING TWO AFRICAN-AMERICAN MEMBERS OF THE VENIRE PANEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION.
 [SUPPLEMENTAL] ASSIGNMENT OF ERROR #2
 APPELLANT, WHO WAS SENTENCED ON MULTIPLE CHARGES, WAS ENTITLED TO CREDIT FOR 427 DAYS OF PRETRIAL DETENTION AGAINST ALL CONCURRENT TERMS, WHICH INCLUDE HIS SENTENCES FOR HIS FELONY-MURDER AND BURGLARY CONVICTIONS. THE FAILURE TO AWARD JAIL TIME CREDIT AGAINST ALL CONCURRENT TERMS VIOLATES R.C. § 2967.191 AND THE EQUAL PROTECTION CLAUSES OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND SECTION 2, ARTICLE I OF THE OHIO CONSTITUTION.
 [SUPPLEMENTAL] ASSIGNMENT OF ERROR #3
 THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS UNDER THE OHIO RULES OF EVIDENCE AND THE CONFRONTATION CLAUSE BY DETERMINING THAT ALAIND WAS UNAVAILABLE UNDER EVID.R. 804 AND PERMITTING THE STATE TO INTRODUCE ALAIND'S TESTIMONY AT THE SECOND TRIAL, WHICH HAD THE EFFECT OF DENYING TRIAL COUNSEL THE OPPORTUNITY TO CONFRONT AND CROSS EXAMINE ALAIND CONCERNING CLOTHING THAT WAS ALLEGEDLY WORN BY THE APPELLANT DURING THE BURGLARY AND THAT WAS INTRODUCED FOR THE FIRST TIME AT THE SECOND TRIAL. *Page 9 
 {¶ 17} Defendant alleges by his first assignment of error that the trial court erred in not suppressing evidence obtained from his encounter with Officer Adkins. Defendant argues that Officer Adkins lacked the necessary articulable and reasonable suspicion to conduct an investigatory stop. However, in the trial court, defendant's counsel did not raise a challenge to defendant's seizure by the police. Therefore, defendant has waived his Fourth Amendment argument absent plain error. See, e.g., State v. Johnson, Franklin App. No. 05AP-12, 2006-Ohio-209, at ¶ 17.
 {¶ 18} Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court. Crim. R. 52(B). For there to be plain error, a reviewing court must find: (1) an error; (2) the error was an obvious defect in the trial proceedings; and (3) the error affected substantial rights; that is, the trial court's error must have affected the outcome of the trial.State v. Clinkscale, Franklin App. No. 06AP-1109, 2008-Ohio-1677, at ¶ 10, citing State v. Barnes (2002), 94 Ohio St.3d 21, 27. However, even if a forfeited error satisfies these three prongs, Crim. R. 52(B) does not demand that an appellate court correct it. Barnes, at 27. "Notice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long (1978), 53 Ohio St.2d 91, syllabus paragraph three.
 {¶ 19} The Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, and Section 14, Article I of the Ohio Constitution, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The language of Section 14, Article I of the Ohio Constitution and the Fourth Amendment to the *Page 10 
United States Constitution are coextensive and provide the same protections.State v. Robinette (1997), 80 Ohio St.3d 234, 238-239. "`[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable.'" Wilson v. Arkansas (1995), 514 U.S. 927, 931,115 S.Ct. 1914, quoting New Jersey v. T.L.O. (1985), 469 U.S. 325, 337,105 S.Ct. 733. Searches and seizures conducted without a warrant are per se unreasonable unless they come within one of the "`few specifically established and well delineated exceptions.'" Minnesota v.Dickerson (1993), 508 U.S. 366, 372, 113 S.Ct. 2130, quotingThompson v. Louisiana (1984), 469 U.S. 17, 20, 105 S.Ct. 409. Evidence is inadmissible if it stems from an unconstitutional search or seizure.Wong Sun v. United States (1963), 371 U.S. 471, 484-485, 83 S.Ct. 407.
 {¶ 20} An investigative stop, or "Terry stop," is a common exception to the Fourth Amendment warrant requirement. Terry v. Ohio (1968),392 U.S. 1, 20-22, 30-31, 88 S.Ct. 1868. A Fourth Amendment seizure, which includes a Terry stop, occurs when, in view of all the surrounding circumstances, a "reasonable person" would have believed that "he was not free to leave." United States v. Mendenhall (1980), 446 U.S. 544,554, 100 S.Ct. 1870. A police officer may stop an individual if the officer has a reasonable suspicion, based upon specific and articulable facts, that criminal behavior has occurred or is imminent.Terry. However, an officer's mere "hunch" is insufficient to justify a Terry stop. Id. at 27. The propriety of an investigative stop must be viewed in light of the totality of the circumstances. State v.Freeman (1980), 64 Ohio St.2d 291, paragraph one of the syllabus.
 {¶ 21} Because defendant did not make his Fourth Amendment challenge in the trial court, no suppression hearing was held. Thus, the reasons for Officer Adkins *Page 11 
stopping defendant may not have been fully developed in the trial court. Nonetheless, evidence at the trials supported the officer's decision to conduct a Terry stop.
 {¶ 22} The evidence indicated that when the shooting was reported on the police radio at approximately 4:30 a.m., Officer Adkins was only one mile from the store. While en route, the officer received additional information that a front window at the store was broken, and that two persons may have been involved. Before he arrived at the Express Market, the officer saw defendant walking on the sidewalk a few blocks from the store. Thus, defendant was observed, in close proximately to where the shooting occurred, shortly after the shooting, and at a time of day in which it is less common for someone to be walking on the sidewalk. In addition, the officer noticed that defendant was cupping something in his hand, and defendant appeared nervous to the officer. We resolve that these facts provided the officer with a reasonable and articulable basis to stop defendant to investigate the reported criminal activity.
 {¶ 23} Accordingly, we overrule defendant's first assignment of error.
 {¶ 24} For ease of analysis, we will address defendant's remaining assignments of error out of order.
 {¶ 25} Because they involve interrelated issues, we will address defendant's fifth, sixth, and seventh assignments of error together. In his fifth assignment of error, defendant alleges that R.C. 2903.02(B) is facially unconstitutional and unconstitutional as applied to him because the state was not required to prove that he purposely killed the decedent and because R.C. 2903.02(B) prohibits identical conduct as R.C. 2903.04 (involuntary manslaughter statute) but subjects offenders to different penalties. By his sixth assignment of error, defendant argues that R.C. 2903.02(B) is inapplicable when the offender can be charged with involuntary manslaughter. Under his seventh assignment *Page 12 
of error, defendant claims that, as a matter of constitutional law, an offender cannot be convicted of felony murder if someone other than a party to the underlying felony was the immediate cause of the death or if the person killed was a co-felon. Defendant also argues that the rule of lenity as codified in R.C. 2901.04(A) is applicable here.
 {¶ 26} R.C. 2903.02(B), Ohio's felony-murder statute, provides as follows: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." Thus, the elements of felony murder under R.C. 2903.02(B) are: (1) cause; (2) the death of another; (3) as a proximate result of the offender's committing or attempting to commit; and (4) an offense of violence that is a felony of the first or second degree and that is not a violation of R.C. 2903.03 (voluntary manslaughter) or R.C. 2903.04
(involuntary manslaughter). State v. Peterson, Franklin App. No. 07AP-303, 2008-Ohio-2838, at ¶ 65, citing State v. Sexton, Franklin App. No. 01AP-398, 2002-Ohio-3617, at ¶ 38.
 {¶ 27} Relying upon common law principles, defendant argues that the statute relieves the state of the burden of proving that the offender "purposely" took the life of the victim. However, in Ohio, statutes, not common law, define crimes. Akron v. Rowland (1993), 67 Ohio St.3d 374,383, fn. 4, citing R.C. 2901.03(A). R.C. 2903.02(B) does not require the state to prove any purpose or specific intent to cause death. The mens rea element for felony murder under R.C. 2903.02(B) is satisfied when the state proves the intent required for the underlying felony.State v. Walters, Franklin App. No. 06AP-693, 2007-Ohio-5554, at ¶ 61, citing State v. Hayden (July 14, 2000), Lake App. No. 99-L-037.
 {¶ 28} Here, the underlying felony is burglary, which is prohibited by R.C. 2911.12. R.C. 2911.12 provides in pertinent part that no person, by force, stealth, or deception, *Page 13 
shall trespass in an occupied structure when another person other than an accomplice is present, with purpose to commit in the structure any criminal offense. The criminal offense alleged in this case, for purposes of the burglary charge, was a theft offense.
 {¶ 29} Defendant argues that his right to equal protection has been violated because R.C. 2903.02(B) treats similarly situated people differently by prohibiting identical conduct as R.C. 2903.04, but subjects the offenders to different penalties. In support of this contention, defendant cites State v. Wilson (1979), 58 Ohio St.2d 52, wherein the Supreme Court of Ohio stated that if "statutes prohibit identical activity, require identical proof, and yet impose different penalties, then sentencing a person under the statute with the higher penalty violates the Equal Protection Clause." Id. at 56. Defendant argues that the state is not required to prove an additional element under R.C. 2903.02(B) beyond what is required to prove involuntary manslaughter under R.C. 2903.04. This same argument was rejected by the Second District Court of Appeals in State v. Dixon, Montgomery App. No. 18582, 2002-Ohio-541. The Dixon court resolved that R.C. 2903.02(B) and2903.04(A) do not prohibit identical activity and require identical proof. The court reasoned as follows:
 * * * Causing another's death as a proximate result of committing any felony, which is sufficient to prove involuntary manslaughter, is not always or necessarily sufficient to prove felony murder. In order to prove felony murder the State is required to prove more: that the underlying felony is an offense of violence, defined in R.C. 2901.01(A)(9), that is a felony of the first or second degree, and not a violation of R.C. 2903.03 or 2903.04.
 * * * Proof of involuntary manslaughter is not sufficient to prove felony murder except in those particular cases where an additional requirement is met: the underlying felony is an offense of violence that is a felony of the first or second degree. *Page 14 
(Emphasis sic.) Because felony murder requires proof of an additional requirement, there is a rational basis for assigning a different, and harsher, penalty to the offense of felony murder. See Dixon. Therefore, defendant's equal protection argument fails.
 {¶ 30} Defendant argues that if an offender can be charged with involuntary manslaughter, then R.C. 2903.02(B) is inapplicable, in view of the express language of the statute. R.C. 2903.02(B) provides that the first or second degree felony that is alleged to have been the proximate cause of the death of another cannot be a violation of R.C. 2903.03 or 2903.04 for the felony murder statute to apply. But, contrary to defendant's argument, R.C. 2903.02(B) does not additionally provide that the felony murder statute is inapplicable when the offender could be charged with involuntary manslaughter. See State v. Walters, Franklin App. No. 06AP-693, 2007-Ohio-5554, at ¶ 65 (noting that even though R.C. 2903.02(B) prohibits voluntary and involuntary manslaughter from serving as the predicate felony, the statute does not prohibit prosecuting an offender for felony murder merely because the offender also could have been charged with voluntary or involuntary manslaughter.)
 {¶ 31} We next address defendant's argument that he cannot be convicted of felony murder because he was not the immediate cause of death and the decedent was a co-felon. In Dixon, the Second District Court of Appeals observed that there are two theories concerning the crime of felony murder. Under the "agency theory," the state must prove that either the defendant, or someone acting in concert with him or her, killed the victim and that the killing occurred during the perpetration of and in furtherance of the underlying felony offense. Dixon, citingMoore v. Wyrick (C.A.8, 1985), 766 F.2d 1253; State v. Chambers (1977),53 Ohio App.2d 266. Conversely, under the "proximate cause theory" of felony murder: *Page 15 
 [I]t is irrelevant whether the killer was the defendant, an accomplice, or some third party such as the victim of the underlying felony or a police officer. Neither does the guilt or innocence of the person killed matter. A defendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the `proximate result' of defendant's conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience.
(Citations omitted.) Dixon.
 {¶ 32} Considering the proximate causation language used in R.C. 2903.02(B), and that the statute does not provide that the defendant or an accomplice must be the immediate cause of death, it is clear that Ohio has adopted the proximate cause theory. See Dixon. Therefore, under Ohio's felony-murder statute, it is irrelevant whether the killer is the defendant, an accomplice, or a third party. State v. Franklin, Mahoning App. No. 06-MA-79, 2008-Ohio-2264, at ¶ 111.
 {¶ 33} Furthermore, although defendant contends that this court should apply the rule of lenity, he does not direct this court to any ambiguity in the language used by the General Assembly in R.C. 2903.02(B). Because we find no ambiguity in the statute, we resolve that the rule of lenity codified in R.C. 2901.04(A) is inapplicable. See, e.g., State v.Moore, Allen App. No. 1-06-51, 2006-Ohio-6860, at ¶ 12 (noting that the rule of lenity applies only where there is an ambiguity in a statute or conflict between multiple statutes).
 {¶ 34} For these reasons, we overrule defendant's fifth, sixth, and seventh assignments of error.
 {¶ 35} Because they involve interrelated issues, we will address defendant's second, third, and fourth assignments of error together. These three assignments of error *Page 16 
concern the sufficiency and weight of the evidence. Defendant's second assignment of error claims that his convictions were not supported by sufficient evidence. Defendant's third assignment of error claims that the trial court erred in denying his Crim. R. 29 motions for judgment of acquittal in both trials. By his fourth assignment of error, defendant argues that his convictions were against the manifest weight of the evidence.
 {¶ 36} In determining the sufficiency of the evidence, an appellate court must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v.Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Also, "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts."Bourjaily v. United States (1987), 483 U.S. 171, 179-180. Whether the evidence is legally sufficient to sustain a verdict is a question of law, not fact. State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 37} A motion for judgment of acquittal, pursuant to Crim. R. 29, tests the sufficiency of the evidence. State v. Darrington, Franklin App. No. 06AP-160, 2006-Ohio-5042, at ¶ 15, citing State v. Knipp, Vinton App. No. 06CA641, 2006-Ohio-4704, at ¶ 11. Accordingly, an appellate court reviews a trial court's denial of a Crim. R. 29 motion for acquittal using the same standard for reviewing a sufficiency of the evidence claim. Darrington, at ¶ 15, citing State v. Barron, Perry App. No. 05 CA 4, 2005-Ohio-6108, at ¶ 38. *Page 17 
 {¶ 38} When assessing whether a conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and ultimately determine "`whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id. at 387, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The jury is in the best position to view the witnesses and observe their demeanor, gestures and voice inflections, and use those observations in weighing the credibility of the testimony. State v.Wright, Franklin App. No. 03AP-470, 2004-Ohio-677, at ¶ 11. Furthermore, "`[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins, at 387, quoting Martin, supra, at 175.
 {¶ 39} We first address defendant's conviction for tampering with evidence, as defendant was convicted of that offense at the first trial. R.C. 2921.12 prohibits tampering with evidence and provides, in pertinent part, as follows:
 (A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
 (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]
 {¶ 40} Officer Adkins' testimony at the first trial indicated that he told defendant to stop on Leona Avenue, and as he approached defendant, defendant was cupping the stockings and gloves in his right hand and was trying to hide the items behind his right *Page 18 
leg. Officer Adkins' testimony at the first trial further indicated that defendant threw the stockings and gloves to the ground and tried to kick the items as the officer was approaching him.
 {¶ 41} When viewed in a light most favorable to the state, the evidence at the first trial supported defendant's conviction for tampering with evidence. Furthermore, we find that this conviction was not against the manifest weight of the evidence, as there is no indication that the jury in the first trial clearly lost its way in convicting defendant of tampering with evidence.
 {¶ 42} Although defendant was not convicted of murder, burglary, or possessing criminal tools at the first trial, we must analyze whether the evidence was sufficient at the first trial to support a conviction for these offenses because if the evidence was not sufficient, the trial court would have been required to grant the Crim. R. 29 motion and enter a judgment of acquittal.
 {¶ 43} The elements of murder and burglary as charged in the indictment were outlined above in reference to defendant's fifth, sixth, and seventh assignments of error. In addition, R.C. 2923.24 prohibits possessing criminal tools and provides in pertinent part that "[n]o person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally." R.C. 2923.24(A).
 {¶ 44} Concerning these three charges, defendant's arguments regarding the sufficiency of the evidence focus on causation issues and the issue of whether he was the second intruder at the Express Market. Defendant argues that the evidence did not demonstrate that he was the second intruder. Defendant also argues that there was insufficient evidence that defendant's alleged participation in the burglary proximately caused Eric Ford's death. According to defendant, the death of his alleged accomplice, *Page 19 
Eric Ford, was not a natural, foreseeable consequence of defendant's alleged participation in the burglary.
 {¶ 45} The evidence at the first trial indicated that, at approximately 4:30 a.m., two mask-wearing men broke into the Express Market, which was closed and locked up, possessing a crowbar and a bag attached to a hoop. Alaind, who was employed to stay at the store during its closed hours, encountered these two men and shot one in fear for his life. Eric Ford, who resided with defendant and was defendant's nephew, was the intruder that was shot and killed. Eric Ford was found wearing a mask and all black clothing, including black gloves. The second intruder fled. At issue was the identity of the second intruder.
 {¶ 46} The evidence at the first trial reasonably supported a finding that defendant was the second intruder at the Express Market. Officer Pappas arrived at the scene shortly after the shooting. Officer Pappas testified that when he asked Alaind whether there was a second intruder involved, Alaind told him that there was a second man who was dressed in all black. The trial court gave a limiting instruction regarding this testimony and essentially instructed the jury that this information constituted background information to explain police conduct and did not constitute substantive evidence. Even so, it could be inferred from the testimony at trial that the second intruder was wearing dark clothing. Alaind could make out the presence of a second intruder, because of ambient light emanating from a refrigeration machine, but had difficulty identifying characteristics of that person considering the darkness of the store. Based on this evidence, it would have been reasonable to infer that the second intruder was dressed in dark clothing. *Page 20 
 {¶ 47} Defendant was approached by Officer Adkins a few blocks from the Express Market in a relatively short amount of time after the shooting. When defendant was approached by Officer Adkins, he was wearing a white shirt, with black shoes and black shorts. Although defendant was found wearing a white shirt, it would have been reasonable for the jury to conclude that defendant discarded the gray sweatshirt, which was found by the police on the ground on Peters Avenue, after he left the scene of the shooting.
 {¶ 48} Defendant explained to Officer Adkins that he was heading home after playing basketball at Mount Vernon Plaza, but the officer was suspicious of that explanation because it was not consistent with the route defendant was taking home. In addition, defendant had stockings and blue rubber gloves in his hand when he was confronted by Officer Adkins, and he threw those items to the ground as the officer approached him. The officer found defendant to have a relatively rapid heartbeat and to be breathing heavily and sweating. This evidence would have supported a finding that defendant had been running before he was observed by Officer Adkins.
 {¶ 49} Viewed collectively, and most favorably to the state, this evidence would have supported a finding that defendant was the second intruder at the Express Market when the other intruder, Eric Ford, was shot and killed.
 {¶ 50} Moreover, defendant's argument that Eric Ford's death was not a reasonably foreseeable consequence of the alleged burglary is unpersuasive. "It is well-established that the death of an accomplice at the hands of the intended victim is a reasonably foreseeable consequence of a robbery or burglary." State v. Sowell (Feb. 18, 2002), Franklin App. No. 91AP-773, citing State v. Chambers (1977), 53 Ohio App.2d 266,270-271. *Page 21 
 {¶ 51} We find that the evidence at the first trial, when viewed in a light most favorable to the state, was sufficient to support a conviction for murder, burglary, and possessing criminal tools.
 {¶ 52} We next address defendant's argument that his convictions for murder, burglary, and possession of criminal tools were not supported by sufficient evidence at the second trial and that these convictions were against the manifest weight of the evidence.
 {¶ 53} The evidence at the second trial mirrored the evidence at the first trial in many significant ways. The evidence at the second trial demonstrated that Eric Ford was shot and killed by Alaind after Eric Ford and another intruder broke into the Express Market when the store was closed and locked. Alaind could see the presence of two intruders but, considering the darkness, had a difficult time identifying their personal characteristics. A crowbar and a bag with a hoop on the end were found near Eric Ford's body. Defendant was confronted by Officer Adkins shortly after the shooting. Defendant threw items to the ground upon being approached by Officer Adkins. These items were later identified as rubber gloves and stockings. Defendant was sweating, stuttering with his speech, and his heart "was beating pretty good." (Aug. 20, 2007, Tr. 30.) Defendant explained to Officer Adkins that he was on his way to his home on East 21st Street, and that he had been playing basketball at the Mount Vernon Plaza. In Officer Adkins' view, defendant's explanation that he was heading to his home from playing basketball seemed to indicate that defendant was backtracking.
 {¶ 54} In addition, the state presented DNA evidence at the second trial indicating that defendant's cells were on the gray sweatshirt that was found by the police after the shooting. Moreover, Gravely, who was jailed with defendant at the Franklin County jail, *Page 22 
testified that defendant told him about a burglary that "went bad" when he and his nephew were confronted and his nephew was killed.
 {¶ 55} We find that the evidence at the second trial was sufficient to convict defendant of murder, burglary, and possessing criminal tools. Like the evidence at the first trial, the evidence at the second trial, when viewed in a light most favorable to the state, supported a finding that defendant was the second intruder at the store when Eric Ford was killed. The evidence supported a finding that Eric Ford and defendant broke into the store with intent to steal. The evidence further supported a finding that Eric Ford's death was a proximate result of the burglary. Lastly, the evidence supported a finding that defendant possessed the rubber gloves and stockings as criminal tools.
 {¶ 56} Moreover, we find that defendant's convictions for murder, burglary, and possessing criminal tools were not against the manifest weight of the evidence. Based on our review of the evidence, we cannot conclude that the jury lost its way in finding defendant guilty of murder, burglary, and possessing criminal tools.
 {¶ 57} For these reasons, we overrule defendant's second, third, and fourth assignments of error.
 {¶ 58} Defendant's eighth assignment of error alleges that the trial court erred in imposing the sentence on the tampering with evidence count consecutively with the sentences on the other counts. More particularly, defendant argues that the Supreme Court of Ohio's severance remedy announced in State v. Foster, 109 Ohio St .3d 1,2006-Ohio-856, as applied to his case, violates due process and ex post facto principles because it was retroactively applied to him. This argument is unpersuasive.
 {¶ 59} Foster was decided on February 27, 2006, and this case involves crimes committed in June 2006. Thus, Foster was not applied retroactively to defendant. *Page 23 
Furthermore, even if the Foster severance remedy had been applied retroactively, this court has consistently rejected the due process and ex post facto argument set forth by defendant. See, e.g., State v.Jordan, Franklin App. No. 07AP-52, 2007-Ohio-5097. Therefore, defendant's eighth assignment of error is overruled.
 {¶ 60} Defendant's ninth assignment of error alleges that the trial court erred in giving "ambivalent" jury instructions on causation as to the murder charge, and in not giving a more specific jury instruction regarding circumstantial evidence. Defendant's counsel objected to the circumstantial evidence instruction, but did not object to the causation instruction, thus waiving the latter issue absent plain error.
 {¶ 61} "When reviewing a trial court's jury instruction, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested instruction was an abuse of discretion under the facts and circumstances of the case." State v. Gover, Franklin App. No. 05AP-1034, 2006-Ohio-4338, at ¶ 22, citing State v. Wolons (1989),44 Ohio St.3d 64, 68; State v. Dovangpraseth, Franklin App. No. 05AP-88,2006-Ohio-1533; State v. Phipps, Mahoning App. No. 04 MA 52,2006-Ohio-3578. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 62} We first address defendant's argument regarding the jury instructions on causation. At the second trial, the trial court instructed the jury in part as follows:
 A defendant's legal responsibility is not limited to the immediate or most obvious result of their actions or failure to act. A defendant is also responsible for the natural and foreseeable consequences that follow in the ordinary course of events from their acts or failure to act.
 There may be one or more causes of an event. However, if Lawrence Ford's act or failure to act was one cause, then the existence of other causes is not a defense to the crime. *Page 24 
 A defendant is responsible for the natural consequences of their actions, even though an injury or death is also caused by the intervening acts or failure to act of another person.
(Aug. 21, 2007, Tr. 195.)
 {¶ 63} Defendant argues that this instruction should have included the following additional language: "defendant is responsible for the natural and foreseeable consequences that follow from the ordinary course of events from their acts or failure to act, as opposed to an extraordinaryor surprising consequence, when viewed in the light of ordinaryexperience." (Emphasis sic.) (Defendant's merit brief, at 26.) According to defendant, this additional language would have removed ambiguity and helped the jury in its application of the instructions to the facts. In this regard, defendant asserts that the jury's confusion regarding the murder charge is substantiated by its question of "Under what circumstances could the defendant be found guilty of burglary and not found guilty of felony murder?" (Aug. 21, 2007, Tr. 211.)
 {¶ 64} The language advocated by defendant regarding causation constitutes different language on the issue, and helps indirectly define what a natural and foreseeable consequence is by stating what it is not. However, the instructions given to the jury accurately reflected the law. The fact that more information could have been provided on the issue does not mean that the instruction as given was ambiguous. Furthermore, despite defendant's urging, we will not speculate as to why the jury asked this question for purposes of its deliberations.
 {¶ 65} Next, we address defendant's challenge to the circumstantial evidence instruction. As part of its instruction to the jury on circumstantial evidence, the trial court stated that "[circumstantial evidence is proof of facts or circumstances by direct evidence *Page 25 
from which you may reasonably infer other related or connected facts which naturally and logically follow according to the common experience of mankind." Id. at 185-186. After given an example of circumstantial evidence, the trial court continued to explain:
 To infer or to make an inference is to draw a reasonable conclusion of fact which you may make but are not required to make from other facts which you find have been proven. Whether an inference is made rests entirely with you.
 You may infer a fact or facts only from other facts that have been proven by the evidence, but you may not infer a fact or facts from some speculative or remote basis that has not been established by the evidence.
Id. at 186.
 {¶ 66} At trial, defendant's counsel argued that the circumstantial evidence instruction should have included language indicating that the jury could draw more than one inference from any given set of facts. Defendant's counsel noted that the instructions did not indicate whether the jury could or could not draw more than one inference from the same facts or circumstances. During closing argument, defendant's counsel had stated that "the law says you can make more than one inference from any set of facts." Id. at 153. He argued that if inferences were made from the direct facts, they indicated that defendant was not at the store that night and was simply walking home.
 {¶ 67} Although the instruction does not expressly state that more than one inference may be drawn from the same facts or circumstances, the instruction does accurately explain circumstantial evidence and inferences. The trial court did not erroneously instruct the jury that it could not draw more than one inference from the same facts or circumstances. Furthermore, even though defendant's counsel's statements during closing argument did not constitute jury instructions, nothing rebutted the assertion made by defendant's counsel regarding the ability of the jury to draw more than one *Page 26 
inference from the same facts or circumstances. Additionally, defendant's counsel was not precluded from making arguments derived from the understanding that more than one inference can be made from the same facts or circumstances. In sum, defendant has not demonstrated that he was prejudiced by the trial court not instructing the jury that it could draw more than one inference from the same facts or circumstances. Therefore, any error by the trial court in not instructing the jury on this point of law was harmless error. See Crim. R. 52(A) (stating that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.").
 {¶ 68} Accordingly, we overrule defendant's ninth assignment of error.
 {¶ 69} Defendant's tenth assignment of error claims that he received ineffective assistance of counsel. In order to obtain reversal of a conviction based upon ineffective assistance of counsel, a defendant must satisfy the two-prong test set forth in Strickland v.Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. Pursuant toStrickland, defendant must first demonstrate that his trial counsel's performance was deficient. In this regard, a court reviewing an ineffective assistance of counsel claim must determine whether, under the circumstances, the acts or omissions were "outside the wide range of professionally competent assistance." Id. at 690.
 {¶ 70} Second, in order for defendant to establish ineffective assistance of trial counsel, he must demonstrate that the deficient performance prejudiced him. This requires defendant to show "that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result is reliable." Id. at 687. In other words, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. *Page 27 
 {¶ 71} Defendant sets forth various reasons why, in his view, his counsel was deficient. Specifically, defendant argues that his counsel should have sought the suppression of the evidence obtained from Officer Adkins' stop of defendant; moved to dismiss the murder charge on statutory, common law, and constitutional grounds; objected to the trial court imposing the sentence on the tampering with evidence count consecutively with the sentences on the other counts; and objected to the ambiguity of the jury instructions on causation.
 {¶ 72} Based on our analyses concerning defendant's first, fifth, sixth, seventh, eight, and ninth assignments of error, we find that defendant's counsel was not deficient for not making these objections or motions, as they properly would have been overruled or denied. Counsel is not ineffective for failing to raise claims that are not meritorious.State v. Underdown, Franklin App. No. 06AP-676, 2007-Ohio-1814, at ¶ 21.
 {¶ 73} Accordingly, we overrule defendant's tenth assignment of error.
 {¶ 74} By his first supplemental assignment of error, defendant argues that the trial court erred by overruling his objection to the state's use of its peremptory challenges to prospective jurors. According to defendant, the reasons provided by the state for excusing these two prospective jurors were merely pretextual, and that the actual reason the state excused these prospective jurors was because they were African-Americans.
 {¶ 75} Crim. R. 32(D) provides that, in a non-capital felony case involving one defendant, each party peremptorily may challenge four prospective jurors. However, the Equal Protection Clause of the United States Constitution precludes purposeful discrimination by the state in the exercise of its peremptory challenges as to exclude members of minority groups from service on petit juries. Id. at 89. Batson v.Kentucky (1986), 476 U.S. 79, 106 S.Ct. 1712. *Page 28 
 {¶ 76} In this case, defendant's counsel objected to the state's exercise of its peremptory challenges on the basis of Batson, essentially arguing that two of the four prospective jurors dismissed by the state were dismissed because they were African-American. The prosecutor explained his reasoning for the peremptory challenges. The trial court overruled the Batson objection.
 {¶ 77} A Batson claim is adjudicated in three steps. State v.Bryan, 101 Ohio St.3d 272, 2004-Ohio-971, at ¶ 106. First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge. Third, the trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination. Id., citing Batson, at 96-98.
 {¶ 78} A race-neutral explanation offered by the prosecution need not rise to the level of a challenge for cause. State v. Cook (1992),65 Ohio St.3d 516. A neutral explanation in this context "means an explanation based on something other than the race of the juror. * * * [T]he issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."Hernandez v. New York (1991), 500 U.S. 352, 111 S.Ct. 1859, at 360. Furthermore, a trial court's findings of no discriminatory intent will not be reversed on appeal unless it is clearly erroneous. State v.Hernandez (1992), 63 Ohio St.3d 577, 583, following Hernandez,500 U.S. 352.
 {¶ 79} To establish a prima facie case of purposeful discrimination, a defendant must first establish that: (1) members of a cognizable racial group were peremptorily challenged; and (2) the facts and any other relevant circumstances raise an inference that *Page 29 
the prosecutor used the peremptory challenges to exclude jurors on account of their race. State v. Raglin (1998), 83 Ohio St.3d 253, 265, citing State v. Hill (1995), 73 Ohio St.3d 433. However, it is not necessary to determine the first question of whether defendant made a prima facie showing of racial discrimination when a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination. In that circumstance, the preliminary issue of whether the defendant had made a prima facie showing becomes moot. SeeHernandez, 500 U.S. 352, 359; State v. Santiago, Franklin App. No. 02AP-1094, 2003-Ohio-2877, at ¶ 8.
 {¶ 80} Here, the prosecutor explained that one of the African-American prospective jurors was dismissed because she may have served food to defendant for months. This prospective juror had stated that she was a cook with the Franklin County Sheriff's Department and that she cooked for staff and inmates. The prosecutor's explanation clearly reflected a concern that the prospective juror may have had contact with defendant during his time at the Franklin County jail. We find no inherent discriminatory intent in this explanation. Additionally, the prosecutor explained that the other African-American prospective juror's significant hesitation in answering questions indicated a lack of intelligence. In this regard, it has been stated that a juror's lack of intelligence constitutes a race-neutral reason for removal. SeeState v. Herring (2002), 94 Ohio St.3d 246, 256. Indeed, there is no inherent discriminatory intent in such an explanation.
 {¶ 81} The trial court ruled that the challenges were not motivated by race. This finding is entitled to deference because it turns on its evaluation of credibility. See Bryan, supra, at ¶ 110, citing State v.White (1999), 85 Ohio St.3d 433, 437; see, also, Santiago, *Page 30 
supra, citing Henderson, supra (noting that the trial court is in a far better position than an appellate court to determine whether the reasons asserted by the prosecutor are based on causes other than racial discrimination). Upon review, we conclude that the trial court's finding that the peremptory challenges were not racially motivated is supported by the record and is not clearly erroneous.
 {¶ 82} Accordingly, we overrule defendant's first supplemental assignment of error.
 {¶ 83} Defendant's second supplemental assignment of error claims that the trial court failed to award him 427 days of jail-time credit. "Jail-time credit" is commonly used as shorthand for custody credit.State v. Fugate, 117 Ohio St.3d 261, 2008-Ohio-856, fn. 1. Pursuant to R.C. 2967.191, a prisoner receives credit for any time spent in confinement "for any reason arising out of the offense for which the prisoner was convicted and sentenced, including confinement in lieu of bail while awaiting trial, confinement for examination to determine the prisoner's competence to stand trial or sanity, and confinement while awaiting transportation to the place where the prisoner is to serve the prisoner's prison term." The amount of credit the prisoner is entitled to receive is determined by the sentencing court. See Ohio Adm. Code 120-2-04(B). In Fugate, the Supreme Court of Ohio held that "[w]hen a defendant is sentenced to concurrent prison terms for multiple charges, jail-time credit pursuant to R.C. 2967.191 must be applied toward each concurrent prison term." Id. at syllabus.
 {¶ 84} Defendant was arrested on June 30, 2006, and after his convictions in this case, he was sentenced on August 30, 2007. In sentencing defendant in this case, the trial court determined that defendant is not entitled to any jail-time credit considering the community control that was imposed upon defendant in two other previous cases. Considering the Supreme Court of Ohio's decision inFugate, this determination was *Page 31 
erroneous. Furthermore, the state concedes that defendant is entitled to 427 days of jail-time credit in view of Fugate.
 {¶ 85} Therefore, we sustain defendant's second supplemental assignment of error.
 {¶ 86} By his third supplemental assignment of error, defendant argues that the trial court erred in admitting, at the second trial, Hussam Alaind's testimony from the first trial because the state did not establish Alaind's unavailability and the trial court denied his trial counsel the opportunity to cross-examine Alaind concerning a gray sweatshirt that was introduced for the first time at the second trial.
 {¶ 87} Since filing his brief containing his third supplemental assignment of error, defendant has filed a notice of withdrawal of a portion of this assignment of error. This notice provides that defendant withdraws the portion of his third supplemental assignment of error insofar as he contends that the trial court did not admit the gray sweatshirt in the first trial and did not properly afford trial counsel an opportunity to cross-examine Alaind regarding the sweatshirt during the second trial. However, defendant notes that he still contends that the trial court erred in allowing Alaind's testimony from the first trial to be admitted into evidence at the second trial because it violated the Ohio Rules of Evidence and Crawford v. Washington (2004),541 U.S. 36, 124 S.Ct. 1354, "particularly in light of the new DNA testimony regarding said sweatshirt offered at the second trial." (Defendant's June 25, 2008 Notice of Withdrawal.) Defendant essentially argues that he never had an opportunity to cross-examine Alaind in further detail about the gray sweatshirt in view of the DNA evidence admitted at the second trial.
 {¶ 88} Evid. R. 804(B)(1) allows the use of former testimony if the declarant is unavailable as a witness, and states as follows: *Page 32 
 The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 (1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. Testimony given at a preliminary hearing must satisfy the right to confrontation and exhibit indicia of reliability.
 {¶ 89} The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." TheSixth Amendment is made applicable to the states through theFourteenth Amendment to the United States Constitution. Pointer v. Texas (1965),380 U.S. 400, 85 S.Ct. 1065, at 403-406. The right to confrontation may require exclusion of certain types of hearsay statements, even if those statements would otherwise be admissible under an exception to the hearsay rule. See Crawford, supra. In Crawford, the Supreme Court of the United States held that out-of-court statements that are testimonial are barred under the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether the statements are deemed reliable by the trial court.
 {¶ 90} Alaind testified at the first trial and defendant's counsel cross-examined him. Even so, defendant essentially argues that Alaind's testimony did not constitute "former testimony" insofar as defendant's counsel was unable to cross-examine him regarding the DNA found on the gray sweatshirt. Although the DNA evidence was not brought forth at the first trial, defendant's counsel at the first trial had an opportunity and similar motive to develop any testimony regarding what the second intruder was wearing. Defendant's *Page 33 
counsel did in fact cross-examine Alaind regarding his ability to see what the intruders were wearing. Moreover, Alaind was not an expert who could have provided testimony to rebut the state's expert concerning the DNA analysis conducted on the sample from the sweatshirt. Thus, we find that Alaind's testimony at the first trial constituted "former testimony" for purposes of Evid. R. 804(B)(1).
 {¶ 91} Additionally, defendant argues that it was not shown that Alaind was unavailable as a witness at the second trial. Under Evid. R. 804(A)(5), a declarant is "unavailable as a witness" when he or she "is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance * * * by process or other reasonable means." In State v. Keairns (1984),9 Ohio St.3d 228, the Supreme Court of Ohio held that: "A showing of unavailability under Evid. R. 804 must be based on testimony of witnesses rather than hearsay not under oath unless unavailability is conceded by the party against whom the statement is being offered." Id. at paragraph three of the syllabus. Also, "[a] witness is not considered unavailable unless the prosecution has made reasonable efforts in good faith to secure his presence at trial." Id. at 230.
 {¶ 92} On the first day of the second trial, an evidentiary hearing was held concerning whether Alaind's testimony at the first trial could be read into evidence at the second trial. Defense counsel did not concede Alaind's unavailability.
 {¶ 93} Detective McGahhey testified as follows concerning the efforts that were made to secure Alaind's presence at the second trial. Alaind, who is from Jordan, was living in New Orleans in February 2007. Alaind was reluctant to testify, but he ultimately was persuaded to testify at the first trial. The detective met with Alaind and his brother a few days before the second trial was originally scheduled to begin, August 6, 2007, and *Page 34 
he served Alaind with a personal service subpoena. Alaind did not appear at court on August 6, 2007. The detective was given a personal service subpoena to serve on Alaind for the August 17, 2007, trial date, but he was unable to find Alaind. Sometime between August 6, 2007, and the start of trial on August 17, 2007, the detective talked with Alaind's brother. Alaind's brother believed that Alaind was in Columbus, but he did not know exactly where his brother was living. The detective was unable to contact Alaind, despite leaving three messages for him. He also searched for Alaind at the convenience store owned by Alaind's brother, as well as the Express Market. In a final effort to find Alaind, the detective went to Alaind's brother's residence the night before the trial began on August 17, 2007. Alaind was not there.
 {¶ 94} The lead prosecutor explained his and another prosecutor's efforts to secure Alaind's presence at the second trial. A prosecutor was at court on August 6, 2007, and waited for Alaind to arrive, but he did not show. The lead prosecutor sent subpoenas to New Orleans and Columbus addresses, but he did not hear from Alaind. He left a message on Alaind's brother's cell phone on August 15, 2007, but received no response.
 {¶ 95} Although the prosecutor's statements were not under oath, defense counsel did not object to the prosecutor's statements on the basis that they were unsworn. However, without even considering the statements of the prosecutor, the testimony of the detective provided ample evidence that reasonable efforts in good faith were made to secure Alaind's presence at the second trial. Therefore, we resolve that the trial court did not err in finding that Alaind was "unavailable as a witness" at the second trial for purposes of Evid. R. 804(A)(5). *Page 35 
 {¶ 96} For these same reasons, we find that Alaind was unavailable and defendant had a prior opportunity for cross-examination for purposes ofCrawford. Thus, the trial court did not err in allowing Alaind's testimony from the first trial to be admitted as evidence in the second trial because the testimony was admissible under both Evid. R. 804(B)(1) and Crawford.
 {¶ 97} Accordingly, we overrule defendant's third supplemental assignment of error.
 {¶ 98} For the reasons set forth above, we overrule defendant's first ten assignments of error. We also overrule defendant's first and third supplemental assignments of error and sustain defendant's second supplemental assignment of error. Accordingly, we affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas and remand this matter to that court with instructions to amend its judgment entry to reflect a certification of 427 days of jail-time credit in this case.
Judgment affirmed in part and reversed in part; cause remanded withinstructions.
 SADLER J., concurs. TYACK, J., dissents.