[Cite as *State v. Williams*, 2012-Ohio-6083.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 10CA3381 |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | DECISION AND |
| v. | : | JUDGMENT ENTRY |
| | : | |
| CHRISTINA M. WILLIAMS, | : | |
| | : | **RELEASED 12/10/12** |
| | : | |
| Defendant-Appellant. | : | |

_____
APPEARANCES:

Timothy Young, Ohio Public Defender, and Craig Jaquith and Sarah LoPresti, Ohio Assistant Public Defenders, Columbus, Ohio, for appellant.

Mark E. Kuhn, Scioto County Prosecuting Attorney and Julie Hutchinson, Scioto County Assistant Prosecuting Attorney, Portsmouth, Ohio, for appellee.
_____
Harsha, J.

{¶1}    Christina Williams appeals several of her convictions resulting from the robbery and murder of Gary Markins, Sr. and Nina Mannering.  First she argues that she was deprived of the effective assistance of counsel because her attorney failed to move to suppress statements she made during a police interrogation.  However, because of the overwhelming amount of other evidence that implicates her in the crimes, Williams cannot show that counsel's performance prejudiced her at trial.  Therefore, we overrule her first assignment of error.

{¶2}    Williams also claims that her convictions for the aggravated murder of Nina Mannering are against the manifest weight of the evidence and not supported by sufficient evidence because she could not have reasonably foreseen Mannering's death.  However, Mannering's death was not an extraordinary or surprising result given

that Williams and an armed co-conspirator went to Markins, Sr.'s home to commit aggravated robbery and burglary knowing that Mannering was present. Therefore, it was foreseeable that Mannering could have been killed in such a crime. Williams' convictions were neither against the manifest weight of the evidence nor supported by insufficient evidence.

{¶3}  Finally, Williams contends that her convictions for aggravated robbery and aggravated burglary should merge with her convictions for aggravated murder because they are allied offenses of similar import and were committed with a single animus. Because it is possible to commit aggravated murder and aggravated robbery, as well as aggravated burglary, with the same conduct they are offenses of similar import. However, Williams can still be sentenced on all the offenses if she committed the crimes separately or with a separate animus. Therefore, we remand the case to the trial court to determine whether her convictions should merge for sentencing.

## I. OVERVIEW

{¶4}  On the morning of January 8, 2010, Gary Markins, Sr. and Nina Mannering were shot to death in his home. At the time, Christina Williams was dating Gary Markins, Jr., and they were both living in her trailer located behind Markins, Sr.'s home. Although Williams had previously lived with Markins, Sr. in his house, Mannering and her young daughter had moved in shortly before his death. Markins, Jr. was estranged from his father and had not seen him for some time prior to his death. Markins, Jr. and Williams were both addicted to drugs and Markins, Sr. would supply Williams with drugs, which she would share with Markins, Jr.

{¶5}   Williams was indicted on eleven counts relating to the robbery and deaths of Markins, Sr. and Mannering.  At trial the state presented evidence to show that Williams, Markins, Jr., her cousin Cecil Conley, and his friend Roy, devised a plan to burglarize and rob Gary Markins, Sr.  The state claimed that Williams provided information about how to gain access to Markins, Sr.'s home, as well as information regarding his safe, firearm, and drugs within the residence.  The state also claimed that Conley, with Williams' aid, entered the home and murdered Gary Markins, Sr. and Nina Mannering.  And after the homicides, Conley contacted Williams, who along with Markins, Jr. and Roy, helped him flee the scene.

{¶6}   Prior to trial, Mannering participated in three interviews with law enforcement in which she gave inconsistent statements and provided different accounts of what happened.  During its case-in-chief, the state showed videos of these interviews to the jury and entered them into evidence.  Williams also testified at trial and denied any involvement in the planning and commission of the crime.

{¶7}   The jury convicted Williams of two counts of aggravated murder for the death Gary Markins, Sr. and two counts of aggravated murder for the death of Nina Mannering.  She was also found guilty of aggravated burglary, aggravated robbery, as well as other offenses unrelated to this appeal.[1]

## II. ASSIGNMENTS OF ERROR

{¶8}   Williams presents the following four assignments of error:

---

[1] Williams was also convicted of kidnapping, in violation of R.C. 2905.01(A)(2), conspiracy to aggravated burglary, in violation of R.C. 2923.01, conspiracy to aggravated robbery, in violation of  R.C. 2923.01, and tampering with evidence, in violation of R.C. 2921.12.  The jury found Williams not guilty of theft of a motor vehicle and the firearms specification.

{¶9}   1. "THE PERFORMANCE OF TRIAL COUNSEL WAS DEFICIENT, AND DEPRIVED MS. WILLIAMS OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION."

{¶10}  2. "THE CONVICTIONS OF CHRISTINA WILLIAMS FOR TWO COUNTS OF AGGRAVATED MURDER, COUNTS TWO AND FOUR, WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE, AND THUS THOSE CONVICTIONS WERE OBTAINED IN VIOLATION OF MS. WILLIAMS' DUE PROCESS RIGHTS.  FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; SECTIONS 5 AND 16, ARTICLE I OF THE OHIO CONSTITUTION."

{¶11}  3. "THE CONVICTIONS OF MS. WILLIAMS FOR TWO COUNTS OF AGGRAVATED MURDER, COUNTS TWO AND FOUR, ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION."

{¶12}  4. "THE TRIAL COURT ERRED WHEN IT IMPOSED SEPARATE SENTENCES FOR OFFENSES THAT AROSE FROM THE SAME CONDUCT, WERE NOT COMMITTED SEPARATELY OR WITH A SEPARATE ANIMUS, AND SHOULD HAVE BEEN MERGED FOR SENTENCING PURPOSES UNDER R.C. 2941.25."

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

{¶13} Williams argues that she was deprived of the effective assistance of counsel at trial.  She bases this claim on her trial counsel's failure to file a motion to

suppress her statements from the January 13, 2010 meeting with Detective Conkel. During this meeting she made several incriminating statements, including that Conley planned to rob Markins, Sr. at gunpoint and that she attempted to help Conley enter the home. Williams contends that she did not effectively waive her right to counsel under the Fifth and Sixth Amendments before being interrogated. Therefore, she maintains that her statements should have been suppressed.

## A. Legal Standard

**{¶14}** To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, that is, performance falling below an objective standard of reasonable representation; and (2) prejudice, meaning that there is a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus. In applying these standards we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland* at 689. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

**{¶15}** "Failing to file a motion to suppress does not constitute ineffective assistance of counsel per se. To establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question." (Citation omitted.) *State v. Brown*, 115 Ohio St.3d 55, 2007-

Ohio-4837, 873 N.E.2d 858, ¶ 65.  Furthermore, the Supreme Court of Ohio has "rejected claims of ineffective counsel when counsel failed to file or withdrew a suppression motion when doing so was a tactical decision, there was no reasonable probability of success, or there was no prejudice to the defendant." *State v. Nields*, 93 Ohio St.3d 6, 34, 752 N.E.2d 859 (2001).

### B. Deficient Performance

### 1. The Fifth Amendment

**{¶16}** The Fifth Amendment to the United States Constitution provides that an individual shall not "be compelled in any criminal case to be a witness against himself." "It has been the consistent view of the United States Supreme Court that the Fifth Amendment protects one accused of a crime from being coerced into testifying against himself.  In order to assure that any statements made by a criminal defendant are voluntary, *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, requires that the accused be apprised of his rights prior to questioning." *State v. Wiles*, 59 Ohio St.3d 71, 82-83, 571 N.E.2d 97 (1991).  "*Miranda* thus declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation." *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

**{¶17}** "[T]he requirement that police officers administer *Miranda* warnings applies only when a suspect is subjected to both custody and interrogation." *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037, ¶ 24, citing *Miranda, supra*.  "The Court in *Miranda* required suppression of many statements that would have been admissible under traditional due process analysis by presuming that statements

made while in custody and without adequate warnings were protected by the Fifth

Amendment." *Oregon v. Elstad*, 470 U.S. 298, 304, 105 S.Ct. 1285, 84 L.Ed.2d 222

(1985). "Failure to administer *Miranda* warnings creates a presumption of compulsion.

Consequently, unwarned statements that are otherwise voluntary within the meaning of

the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*." *Id.*

at 306.

{¶18} The "term 'interrogation' under *Miranda* refers not only to express

questioning, but also to any words or actions on the part of the police (other than those

normally attendant to arrest and custody) that the police should know are reasonably

likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446

U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). "By 'incriminating response' we

refer to any response-whether inculpatory or exculpatory-that the prosecution may seek

to introduce at trial." *Id.* at fn. 5.

{¶19} A suspect who volunteers information without being asked any questions

is not subject to a custodial interrogation and is not entitled to *Miranda* warnings. *State*

*v. McGuire*, 80 Ohio St.3d 390, 401, 686 N.E.2d 1112 (1997). In other words, "*Miranda*

does not affect the admissibility of '[v]olunteered statements of any kind.'" *Id.,* citing

*Miranda*, 384 U.S. at 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). When a defendant

initiates communication, "nothing in the Fifth and Fourteenth Amendments would

prohibit the police from merely listening to his voluntary, volunteered statements and

using them against him at the trial." *Edwards*, 451 U.S. at 485, 101 S.Ct. 1880, 68

L.Ed.2d 378 (1981).

{¶20} However, "[i]f, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be 'interrogation.' In that event, the question becomes whether a valid waiver of the right to counsel and the right to silence had occurred * * *." *Id.* at fn. 9.

{¶21} In this case, the record reflects that Williams requested the January 13, 2010 meeting with Detective Conkel; however, she was not read her *Miranda* rights prior to the conversation. Nor was her counsel present during the interview. Rather, the record shows the following exchange between Detective Conkel and Williams at the start of the meeting.

> Detective Conkel: Over in the jail you said you wanted to talk to me.
>
> Williams: Yeah.
>
> Detective Conkel: You still want to talk to me?
>
> Williams: Yeah.
>
> Detective Conkel: Okay, because I have to ask you that because you
> have an attorney. You do know that?
>
> Williams: Um-huh.

{¶22} Detective Conkel began the meeting by telling Williams that she needed to tell the truth because she had nothing to lose and to "start from the very beginning." This is not a situation where a detective listened to Williams' voluntary statement and then used it against her at trial. Rather, Williams made incriminating statements in response to Detective Conkel's continued questioning throughout their meeting. For example, Conkel asked Williams "[s]o how did they plan to do this robbery?" and "how

was you guys going to get in [the house]?" It is clear that these types of questions by Detective Conkel were intended to induce an incriminating response from Williams, especially in light of the fact that Williams had been interviewed twice before and charged in the case. Thus, she was subjected to interrogation within the meaning intended by *Miranda*. As there was no doubt that Williams was also in custody at this time, there was a basis for the motion.

### 2. The Sixth Amendment

{¶23} The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence," and prevents law enforcement from deliberately eliciting incriminating statements from criminal defendants in the absence of counsel. *Massiah v. United States*, 377 U.S. 201, 205-207, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Unlike the right to counsel under the Fifth Amendment, the Sixth Amendment right to counsel attaches at the initiation of adversary judicial proceedings. *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991).

{¶24} However, a defendant may be questioned when he knowingly and intelligently waives his Sixth Amendment right to counsel. *Patterson v. Illinois*, 487 U.S. 285, 292, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). "[A]n accused who is admonished with the warnings prescribed by this Court in *Miranda* * * * has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." *Id.* at 296.

**{¶25}** In this case, we have our doubts about whether Williams required a fresh set of *Miranda* warnings prior to her interview with Detective Conkel. However, there was at least a basis for the motion and even assuming arguendo counsel's performance was deficient by failing to move to suppress her statements, Williams cannot prove she was prejudiced by trial counsel's performance.

## C. Prejudice

**{¶26}** Although trial counsel's performance may have been deficient, the second prong of the *Strickland* test also requires that Williams was prejudiced by the performance. Considering the rest of the evidence offered by the state at the trial, we are not convinced there is a reasonable probability that she would have been acquitted in the absence of her admissions from the January 13, 2010 interview.

**{¶27}** At the trial, Shannon Tomblin testified that she knew Mannering and Williams through the "drug culture." She stated that Williams and Markins, Jr. discussed robbing Markins, Sr. every time she visited Williams' home and that Williams told her he needed to be killed because he slept with a gun. Tomblin also stated that Williams tried to steal Markins Sr.'s gun approximately a week before the murders, because she was hoping he would not get another one before they attempted the robbery. Furthermore, Tomblin testified that Williams told her that her cousin had been in prison and had the nerve to commit the robbery.

**{¶28}** Sharon Pennington also testified about Williams' involvement in the robbery and homicides. She testified that she met Williams while incarcerated and Williams told her the plan was to take Markins, Sr.'s pills and break into the safe. Williams knew they would have to kill Markins, Sr. because he had a gun. Pennington

also testified that Williams explained that Conley hid in Markins, Sr.'s garage and that she and Markins, Jr. went over to the house at his request. Williams stated that she knocked on the front door, but Markins, Sr. would not let her in. At this time, Markins, Jr. was in the backyard looking through a window. Subsequently, Conley entered the house and killed Markins, Sr. and Mannering. She also admitted to Pennington that they went early in the morning because they thought Mannering would still be asleep. After the murders, Williams told Pennington that Conley stole Markins, Sr.'s truck and that she and Markins, Jr. picked him up from a church parking lot.

{¶29} Additionally, Williams herself made incriminating statements during her first and second interviews with detectives. During her first interview on January 8, 2010, she admitted that she was addicted to drugs and Markins, Sr. had frequently given her drugs in the past. She told Detective Blaine that Mannering had recently told Markins, Sr. that Williams was living with his son and as a result he "cut [her] off." She also stated that Mannering moved into Markins, Sr.'s home in a "backstabbing" way and that she was aggravated with her because she was trying to stop Markins, Sr. from giving her any drugs. Furthermore, she admitted to knocking on Markins, Sr.'s front door in the early morning hours of January 8, 2010, but said he refused to open the door.

{¶30} During the second interview on January 11, 2010, Williams admitted that Markins, Jr. came up with the plan and Conley committed the robbery and murders. She claimed that she learned of the plan on the day in question while Conley was hiding in Markins, Sr.'s garage. Williams explained that Conley walked from her trailer to Markins, Sr.'s garage and waited inside for someone to leave the home. She spoke

with him numerous times on the telephone and told him that she would go over to Markins, Sr.'s home and try to unlock the door to the garage. She went over to the house and knocked on the front door, but Markins, Sr. would not let her in and she returned home. The next time Conley called, she told him that she could not get into the house. Later, Conley took Markins, Sr.'s truck and they followed him to a church parking lot.

{¶31} At trial Williams testified that Markins, Jr. and Conley planned to rob Markins, Sr. In the early morning of January 8, 2010, she walked over to Markins, Sr's to get cigarettes but he would not open the door. Conley later called and told her to leave because things went wrong. After Conley killed Markins, Sr. and Mannering, she rode with Roy to pick up Conley in a church parking lot. When he got into the car, Conley had two guns, one of which was Markins, Sr.'s, and he was covered in blood and brain matter.

{¶32} Considering this evidence, which undeniably implicates her in the scheme, we cannot say there is a reasonable probability that the trial's result would have been different in the absence of Williams' statements from the January 13, 2010 interview. Thus, Williams cannot demonstrate the prejudice necessary to prevail on an ineffective assistance of counsel claim. Accordingly, we overrule her first assignment of error.

IV. MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE

{¶33} Next Williams argues that there is insufficient evidence to support her convictions for the aggravated murder of Nina Mannering (assignment of error 2) and she also contends these convictions are against the manifest weight of the evidence (assignment of error 3). Specifically, she alleges that Mannering's death was not

reasonably foreseeable because Mannering was not the target of the robbery. Likewise, she contends the state did not present any evidence that Williams believed Mannering was armed or that her death was anticipated as part of the crime. We find her arguments to be meritless.

### A. Standard of Review

{¶34} Although Williams properly separates her assignments of error for insufficient evidence and the manifest weight of the evidence, because they are related we address them together. When an appellate court concludes that the weight of the evidence supports a defendant's conviction, this conclusion also includes a finding that the conviction is supported by sufficient evidence. *State v. Roulette,* 4th Dist. No. 10CA3364, 2011-Ohio-6993, ¶ 32. As a result, a determination that a conviction is supported by the weight of the evidence will also be dispositive of a claim of insufficient evidence.[2]  *Id.* Thus, we consider whether Williams' convictions are supported by the weight of the evidence.

{¶35} When considering whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, and consider the creditability of witnesses to determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

---

[2] The inverse proposition is not always true. *See State v. Thompkins*, 78 Ohio St.3d 380, 387-388, 678 N.E.2d 541 (1997).

**{¶36}** "If the prosecution presented substantial evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, the judgment of conviction is not against the manifest weight of the evidence. *See State v. Eley*, 56 Ohio St.2d 169, 383 N.E.2d 132 (1978), syllabus." *State v. Puckett*, 4th Dist. No. 10CA3153, 2010-Ohio-6597, ¶ 33. Thus, we will exercise our discretionary power to grant a new trial "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541(1997), quoting *Martin,* 20 Ohio App.3d at 175, 485 N.E.2d 717 (1st Dist. 1983).

### B. Legal Standard

**{¶37}** Williams was convicted of aggravated murder in violation of R.C. 2903.01(B), which states "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape."

**{¶38}** "Under Ohio law, 'it is irrelevant whether the killer is the defendant, an accomplice, or a third party.'" *State v. Abdi*, 4th Dist. No. 09CA35, 2011-Ohio-3550, ¶ 74, quoting *State v. Ford*, 10th Dist No. 07AP-803, 2008-Ohio-4373, ¶ 32. A defendant can be held criminally responsible for one's death regardless of the person killed or who caused the death, as long as the death is the "proximate result" of the defendant's conduct in committing the underlying felony offense. *Abdi* at ¶ 74. That is, that the death is "a direct, natural, reasonably foreseeable consequence," as opposed to an

extraordinary or surprising consequence, when viewed in the light of ordinary experience. *Id.* It is not necessary that the defendant be in a position to foresee the precise consequence of his conduct; only that what actually transpired was a natural and logical outcome in that it was within the scope of the risk created by his conduct. *Id.* "'Only a reasonably unforeseeable intervening cause will absolve one of criminal liability in this context.'" *State v. Osman*, 4th Dist. No. 09CA36, 2011-Ohio-4626, ¶ 48, quoting *State v. Dykas*, 185 Ohio App.3d 763, 2010-Ohio-359, 925 N.E.2d 685, ¶ 25 (8th Dist.).

## C. Analysis

{¶39} Williams does not attack her underlying convictions for aggravated robbery and aggravated burglary. Thus she concedes that there was sufficient evidence to support these convictions and they were not against the weight of the evidence. Her aggravated robbery conviction, in violation of R.C. 2911.01(A)(1) required the state to prove that she or an accomplice, had a deadly weapon on or about the offender's person or under the offender's control and either displayed the weapon, brandished it, indicated that the offender possessed it, or used it while attempting or committing a theft offense or in fleeing immediately after the attempt or offense. Her underlying aggravated burglary conviction, in violation of R.C. 2911.11(A)(1), required the state to show that she or an accomplice intended to inflict, or attempted or threatened to inflict physical harm on another, while by force, stealth, or deception, trespassing in an occupied structure, when another person other than an accomplice of the offender is present, with the purpose to commit in the structure any criminal offense.

**{¶40}** The state produced evidence that indicated Williams and her co-conspirators went to Markins, Sr.'s home to commit a robbery and burglary. In addition to the testimony discussed above in Section III(C), Williams herself confessed that the plan to rob Markins, Sr. included Conley holding Markins, Sr. at gunpoint and making him open the safe. She stated that she knew Mannering was in the house on the day in question and they planned to tie her and her daughter up and cover their heads. Finally, she stated that while Conley was going back and forth between her trailer and Markins, Sr.'s garage on the day in question, he fired a gun in her living room. It is reasonably apparent that attempting to rob someone at gunpoint and burglarize their home might lead to gunfire, with the foreseeable death of another victim or bystander. *See State v. Osman*, 4th Dist. No. 09CA36, 2011-Ohio-4626, ¶ 49. The fact that Williams may not have considered or intended Mannering's death does not make it fall outside the scope of the risk created by the aggravated robbery and aggravated burglary. *See id.* Here the state proved that with Williams' help Conley planned to break into Markins Sr.'s home at gun point and rob him while both he and Mannering were present. It was foreseeable that someone could be shot and killed in such a crime. Accordingly, we find that her death was a natural and logical outcome of the robbery and burglary; it was not extraordinary or surprising.

**{¶41}** This is not an exceptional case in which the evidence weighs heavily against the convictions; Williams' convictions for the aggravated murder of Nina Mannering were not against the manifest weight of the evidence. This holding necessarily includes a conclusion that her convictions were also supported by sufficient evidence. Accordingly, we overrule her second and third assignments of error.

## V. ALLIED OFFENSES OF SIMILAR IMPORT

**{¶42}** In her fourth assignment of error Williams contends that her aggravated burglary and aggravated robbery convictions should merge with her aggravated murder convictions because they are offenses of similar import and were committed with the same conduct and a single animus. Because merger creates a legal question, we review it under a de novo standard of review. *State v. Crisp*, 4th Dist. No. 10CA3404, 2012-Ohio-1730, ¶ 25.

### A. Legal Standard

**{¶43}** Under Ohio law, "[w]here the same conduct by [the] defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." R.C. 2941.25(A). But "[w]here the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them." R.C. 2941.25(B).

**{¶44}** This statute "codified the judicial doctrine of merger" and "prohibited the 'cumulative punishment of a defendant for the same criminal act where his conduct can be construed to constitute two statutory offenses, when, in substance and effect, only one offense has been committed.'" *State v. Ware*, 63 Ohio St.2d 84, 86, 406 N.E.2d 1112 (1980), quoting *State v. Roberts*, 62 Ohio St.2d 170, 172-173, 405 N.E.2d 247 (1980). The Supreme Court of Ohio has "consistently recognized that the purpose of R.C. 2941.25 is to prevent shotgun convictions, that is, multiple findings of guilt and

corresponding punishments heaped on a defendant for closely related offenses arising from the same occurrence." *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 43.

**{¶45}** In *Johnson*, the Supreme Court of Ohio announced a new test focused on the defendant's conduct to determine whether merger is required. *Id.* at ¶ 44. To determine whether offenses are allied offenses of similar import under R.C. 2941.25(A), the first question "is whether it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one *without* committing the other." (Emphasis sic.) *Id.* at ¶ 48. "If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import." *Id.*

**{¶46}** Next, "[i]f the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Id.* at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 50 (Lanzinger, J., dissenting). "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged." *Johnson* at ¶ 50.

**{¶47}** "Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge." (Emphasis sic.) *Id.*

**{¶48}** Because Williams failed to object at sentencing on the basis of merger, she has waived all but plain error. *See State v. Osman*, 4th Dist. No. 09CA36, 2011-

Ohio-4626, ¶ 33. Under Crim.R. 52(B), we may take notice of plain errors or defects affecting substantial rights even where a defendant fails to object. Plain error exists when there is a deviation from a legal rule, the error is obvious on the face of the record, and the error affects a substantial right. *State v. Payne,* 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶¶ 15-17. The Supreme Court of Ohio has "held that the imposition of multiple sentences for allied offenses of similar import is plain error." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 31.

## B. Analysis

**{¶49}** Williams was charged and convicted of four counts of aggravated murder, in violation of R.C. 2903.01(B). In counts one and two she was convicted of the aggravated murders of Gary Markins, Sr. and Nina Mannering, while committing, attempting to commit or fleeing after committing aggravated burglary. In counts three and four she was convicted of the aggravated murders of Gary Markins, Sr. and Nina Mannering, while committing, attempting to commit, or fleeing after committing aggravated robbery. Williams was convicted in count five of aggravated burglary, in violation of R.C. 2911.11(A)(1) and in count six of aggravated robbery, in violation of R.C. 2911.01(A)(1). At sentencing, the trial court found that count three merged with count one and count four merged with count two and only sentenced Williams on counts one and two for aggravated murder. She was also sentenced on count five for aggravated burglary and count six for aggravated robbery, which she now claims should merge with her aggravated murder convictions.

**{¶50}** Under the first prong of the *Johnson* analysis, we have already held that a defendant could commit aggravated robbery and felony murder with the same conduct.

*See State v. Osman*, 4th Dist. No. 09CA36, 2011-Ohio-4626, ¶ 32; *State v. Abdi*, 4th

Dist. No. 09CA35, 2011-Ohio-3550, ¶ 39.  By extension, a defendant could also commit

aggravated burglary and felony murder with the same conduct.  Therefore, aggravated

robbery and aggravated (felony) murder are offenses of similar import under R.C.

2941.25(A), as are aggravated burglary and aggravated (felony) murder.   However,

Williams can still be sentenced to both crimes under the second prong of the *Johnson*

analysis if she committed the crimes "separately or with a separate animus." *See* R.C.

2941.25(B).

**{¶51}**  Williams was convicted and sentenced prior to the Supreme Court of

Ohio's ruling in *Johnson*.  Because the trial court did not have the benefit of *Johnson* at

sentencing, we remand the case for resentencing in light of the new analysis it requires.

*See State v. Osman*, 4th Dist. No. 09CA36, 2011-Ohio-4626, ¶ 35.  *See also State v.

Abdi*, 4th Dist. No. 09CA35, 2011-Ohio-3550, ¶ 42.  On remand, the trial court should

consider whether Williams committed aggravated murder separately or with a separate

animus from her aggravated robbery and aggravated burglary offenses and sentence

her accordingly.  Consequently, we sustain Williams' fourth assignment of error in

limited part.

VI. CONCLUSION

**{¶52}**  In conclusion, we overrule Williams' first, second and third assignments of

error.  We sustain her fourth assignment of error in part and remand for resentencing.

JUDGMENT AFFIRMED IN PART,<br/>REVERSED IN PART, AND<br/>CAUSE REMANDED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED IN PART AND REVERSED IN PART and that the CAUSE IS REMANDED.  Appellant and Appellee shall split the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.  Exceptions.

McFarland, J:  Concurs in Judgment and Opinion.
Abele, P.J.:  Concurs in Judgment and Opinion as to Assignments of Error II, III, & IV;
          Concurs in Judgment Only as to Assignment of Error I.

For the Court

BY: _____
     William H. Harsha, Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**